UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| LIBERTARIAN PARTY OF SOUTH DAKOTA;<br>KEN SANTEMA, State Chair of the Libertarian Party of South Dakota;<br>BOB NEWLAND;<br>CONSTITUTION PARTY OF SOUTH DAKOTA;<br>LORI STACEY, State Chair of the Constitution Party of South Dakota; and JOY HOWE,<br><br>      Plaintiffs,<br><br> vs.<br><br>SHANTEL KREBS, in her official capacity as Secretary of State of the State of South Dakota; and<br>MARTY J. JACKLEY, in his official capacity as Attorney General of the State of South Dakota,<br><br>      Defendants. | 4:15-CV-04111-KES<br><br><br>MEMORANDUM OPINION AND ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

  Plaintiffs bring suit against defendants seeking in part a declaratory judgment that South Dakota's ballot access laws for new political parties are unconstitutional. Defendants move for summary judgment, arguing that South Dakota's ballot access laws place reasonable and nondiscriminatory restrictions on political parties. The court denies defendants' motion.

**BACKGROUND**

To be a political party in South Dakota, the party's candidate for governor in the last gubernatorial election must have won at least 2.5% of the votes cast. SDCL 12-1-3(10). If a party does not meet the 2.5% requirement, it must go through the process outlined in SDCL 12-5-1 that discusses the organization and dissolution of a political party. *See* SDCL 12-5-1. Under the statute, a new political party may gain state recognition by filing with the South Dakota Secretary of State a written declaration that contains the party's proposed name and a brief statement of the party's principles. *Id.* The declaration must be signed by "at least two and one-half percent of the voters of the state as shown by the total vote cast for Governor at the last preceding gubernatorial election." *Id.* A voter may sign the declaration at any time as long as the signature is not more than a year old at the time of filing. *Id.* For a party to appear on the June primary ballot, the declaration must be submitted by the last Tuesday in March at five p.m. *Id.*

In 2012, the Libertarian Party and the Constitution Party met the March deadline and filed valid declarations with the Secretary of State. Docket 19 at 5. This meant both parties appeared on the primary and general election ballot in 2012 and 2014. During the 2014 general election, neither party had candidates for governor, so neither party received the 2.5% of votes necessary to maintain its political party status. Docket 28 at 2. Because both parties seek participation in the 2016 South Dakota primary election, this year both parties filed new declarations with the South Dakota Secretary of State. Docket 41 at

2

1-2. Based on the procedures set out in SDCL 12-5-1, declarations were due March 29 and needed to be signed by 6,936 voters. Docket 28 at 5. Only the Constitution Party met both requirements. Docket 41 at 1-2. Both parties, however, have met the filing requirements of SDCL 12-5-1 in the past. The Libertarian Party achieved political party status in 1994, 1996, 1998, 2000, 2002, 2004, 2006, 2012, and 2014. Docket 19 at 5. The Constitution Party achieved political party status in 2004, 2006, 2008, 2010, 2012, and 2014. *Id.*

After defendants filed their answer, plaintiffs learned that new political parties may select some of their general election candidates through a state convention instead of a primary vote. Docket 33 at 1-5. In their answer, defendants explained that SDCL 12-5-21 allows new political parties to nominate via state convention candidates for the following positions: lieutenant governor, attorney general, secretary of state, state auditor, state treasurer, commissioner of school and public lands, public utilities commissioner, national committeeman of the party, national committeewoman of the party, and presidential electors. Docket 21 at 3; SDCL 12-5-21. Under this procedure, the party would need to file its declaration in time to give the Secretary of State 30 days' notice of the time and place of the party's convention. Docket 26 at 3-4; SDCL 12-5-17. Because a party must hold its convention in time to certify its nominees with the South Dakota Secretary of State by the second Tuesday in August (SDCL 12-5-22), a new political party in 2016 could file its declaration on July 10 and still have its candidates for offices identified in SDCL 12-5-21 placed on the general election ballot. *See* Docket 26 at 3. This

means new political parties potentially have two deadlines for filing their party's declaration: March or July. Plaintiffs assert this is a new and different interpretation of SDCL 12-5-1 than had been followed previously by South Dakota's Secretaries of State. Docket 33 at 2. Richard Winger explains in affidavits submitted by plaintiffs that 41 other states authorize previously unqualified parties to place all its nominees on the general election ballot without a primary. Docket 40 at 1. He also states that no other state sets a different deadline for ballot access for attorney general or lieutenant governor than governor. Docket 40 at 2. He describes this process as "irrational." *Id.*

Plaintiffs initiated this action on June 15, 2015. Docket 1. On January 26, 2016, the court granted plaintiffs' motion to amend the complaint and denied defendants' motion to dismiss the case or change venue. Docket 18. Plaintiffs filed their amended complaint on January 28, 2016. Docket 19 at 4. Defendants now move for summary judgment, and plaintiffs oppose the motion.

## LEGAL STANDARD

Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party can meet this burden by presenting evidence that there is no dispute of material fact or by showing that the nonmoving party has not presented evidence to support an element of its case on which it bears the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To avoid summary judgment, "[t]he

4

nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.' " *Mosley v. City of Northwoods, Mo.*, 415 F.3d 908, 910 (8th Cir. 2005) (quoting *Krenik v. Cty of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995)).

Summary judgment is precluded if there is a factual dispute that could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). For purposes of a summary judgment motion, the court views the facts and the inferences drawn from such facts "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

## DISCUSSION

The right to vote holds a sacred place in our nation's history. "It is beyond cavil that 'voting is of the most fundamental significance under our constitutional structure.' " *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quoting *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979)). "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Williams v. Rhodes*, 393 U.S. 23, 31 (1968) (internal citation omitted). On the other hand, the right to vote is not absolute. The states hold a broad power to regulate the time, place, and manner of elections. *Green Party of Ark. v. Martin*, 649 F.3d 675 (8th Cir. 2011) (quoting U.S. Const. art. I, § 4,

cl. 1; *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451 (2008)). "Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections . . . 'if some sort of order, rather than chaos, is to accompany the democratic process.' " *Burdick*, 504 U.S. at 433 (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)).

Because of the inherent tension between the individual's right to vote and the state's power to regulate elections, the Supreme Court has set forth a balancing test that considers the interests of both the voter and the state. *Id.* at 432-34. As explained by the Eighth Circuit Court of Appeals, a court analyzing ballot access laws must:

> weigh the character and magnitude of the burden the State's rule imposes on those rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary. Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions.

*Martin*, 649 F.3d at 680 (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 357 (1997)). Under this analysis, the court first considers and defines the burdens imposed by the challenged law and then weighs the burdens against the state's regulatory interests. The degree of the burden determines the extent the challenged law must advance the state's interests. Laws placing severe burdens on the right to vote receive greater judicial scrutiny than laws imposing lesser burdens.

## I. Constitutionality of SDCL 12-5-1

### A. Weighing of Burdens

In general, all ballot access laws impose a burden on "two different, although overlapping, kinds of rights—the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Williams*, 393 U.S. at 30. This does not mean, however, that all ballot access laws are subject to strict scrutiny and that each regulation must be narrowly tailored to advance a compelling state interest. *Brudick*, 504 U.S. at 433. The court must analyze the unique burdens imposed by the challenged legislation and determine whether or not the burden is severe. *See id.* at 434. A burden is severe if it "operate[s] to freeze the political status quo . . . ." *Martin*, 649 F.3d at 685.

The Eighth Circuit Court of Appeals and the United States Supreme Court have addressed the burden issue in a series of opinions. In *McLain v. Meier*, 637 F.2d 1159, (8th Cir. 1980) (*McLain I*), the Eighth Circuit Court of Appeals analyzed a North Dakota statute that regulated how candidates for new political parties could appear on the state's ballot. *Id.* at 1162. In North Dakota, new political parties were required to file a petition signed by 15,000 electors by June 1 of the primary election year. *Id.* At the time the Eighth Circuit decided the case, 15,000 signatures equated to 3.3% of North Dakota's electorate. *Id.* The Eighth Circuit noted that the June 1 deadline—set 90 days before the primary election—was "particularly troublesome" because voters look to third party candidates largely when they are dissatisfied with the

"platforms and candidates put forward by the established political parties." *Id.* at 1164. The Eighth Circuit also found the 15,000 signature requirement "significantly higher than that required in most states," noting the Supreme Court has stated a 1% requirement is "within the outer boundaries of support the State may require before according political parties ballot position." *Id.* at 1163-64 (quoting *Am. Party of Tex. v. White*, 415 U.S. 767, 783 (1974)). Ultimately, the Eighth Circuit held that North Dakota's ballot access laws were unconstitutional. *Id.* at 1163; *see also Anderson v. Celebrezze*, 460 U.S. 780, 806 (1983) (holding as unconstitutional an Ohio law requiring presidential candidates to file their petitions by March 20); *MacBride v. Exon*, 558 F.2d 443, 449-50 (8th Cir. 1977) (holding as unconstitutional a petition deadline set 90 days before the state's primary).

In *McLain v. Meier*, 851 F.2d 1045 (8th Cir. 1988) (*McLain II*), the Eighth Circuit revisited North Dakota's ballot access laws. North Dakota amended its ballot access laws in response to *McLain I* to require new political parties to obtain 7,000 signatures 55 days before the primary election in June. *Id.* at 1047. Although the Eighth Circuit ultimately upheld the constitutionality of North Dakota's statutes, the court found that the 7,000 signature requirement combined with the 55-day deadline produced a "burden of some substance" on the challenger's right to vote. *Id.* at 1049. The Eighth Circuit found North Dakota's statute constitutional because "the filing deadline for third parties [was] no more burdensome on [the challenger's] rights than [was] necessary to support the State's interests." *Id.* at 1050.

8

In *Burdick*, 504 U.S. at 430, the Supreme Court analyzed the burden imposed by Hawaii's prohibition on write-in voting. Although *Burdick* did not explicitly involve a challenge to the state's ballot access laws, the Court addressed the operation and effect of the laws. *Id.* at 434-37. The Court explained that a filing deadline set two months before the state's primary was reasonable because "little weight" is given to candidates' interests and their supporters' interests when they delay in making a decision to appear on the ballot. *Id.* at 437. The Court ruled a filing deadline set two months before the state's primary resulted in a "very limited" burden. *Id.*

In *Martin*, 649 F.3d at 686-87, the Eighth Circuit Court of Appeals upheld a state law that required political parties to receive at least 3% of the votes cast for governor or president in order to maintain its political party status. Plaintiffs argued in part that the 3% requirement created a severe burden because it required the Green Party to conduct a costly petition drive every two years in order to gather the signatures necessary to regain its political party status. *Id.* at 683. The court rejected plaintiffs' argument and explained that a number of factors, including the high costs of campaigning, "make it difficult for third parties to succeed in American politics." *Id.* The court stated, "Although the Green Party may incur some costs because of its choice to hire individuals to collect signatures, the ballot access scheme does not impose severe burdens on the Green Party . . . ." *Id.* The court concluded its analysis of the burdens imposed by the law by asking whether Arkansas's ballot access laws as a whole "operate[d] to freeze the political status quo . . . ."

*Id.* at 685. The Eighth Circuit noted the Green Party had secured ballot access in 2006, 2008, and 2010. *Id.* And Arkansas's statutory scheme consisted of multiple paths to the general election ballot. *Id.* Ultimately, the court concluded that "although the burdens imposed by [Arkansas's ballot access laws] are not trivial, they are not severe." *See id.* at 685 (citing *Timmons*, 520 U.S. at 363).

Plaintiffs here argue the "character and magnitude of the burden" imposed by SDCL 12-5-1 is severe. *Id.*; *see* Docket 33 at 10-22. Plaintiffs assert the combined effect of the "last Tuesday in March" deadline [March 29 as applied] with the 2.5% signature requirement [6,936 signatures as applied] places a severe burden on their constitutional rights. Plaintiffs emphasize in their brief that both of these burdens are exacerbated because of the expense associated with gathering signatures, the difficulty in generating public interest in a third party candidate before the major parties have chosen their nominee, and the fact that signatures would need to be gathered during the winter months in a sparsely populated state. Docket 33 at 7-19.

The cases most analogous to the facts before this court are *McClain I* and *McClain II.* The plaintiffs in *McClain I* challenged a statute requiring new political parties to file a petition with 15,000 signatures by June 1. The Eighth Circuit concluded the restrictions were "unnecessarily oppressive" and "unconstitutional." *McClain I,* 637 F.2d at 1163. The statute in *McClain II* required petitions to be filed with 7000 signatures by approximately mid-April, which was 55 days before the state's June primary election. Although the Eighth Circuit upheld these restrictions, it found that the burden imposed by

10

the law was of "some substance," and the court subjected the statute to strict scrutiny. *McLain II*, 851 F.2d at 1049. Here, the time burden imposed on plaintiffs is greater than the time burden imposed in *McLain II* because new political parties need to submit their declarations by late March-70 days before South Dakota's primary election day. This early deadline is particularly oppressive because, as the court noted in *McLain I*, a third party candidate's viability is largely determined after the major political parties have chosen their candidates and platforms. People often look to third party candidates when they are dissatisfied with the major parties' nominees. The March deadline forecloses a candidate's ability to run for office before the major parties have selected their nominees. Additionally, the deadline of March 29 requires petition circulation to occur during the cold, winter months instead of the springtime as occurred under *McLain I's* June 1 deadline. While the signature burden here of 2.5% [6,936] signatures is comparable to the signature burden in *McLain II* and is less than in *McLain I*, the court finds that the late March time burden coupled with the substantial signature requirement is particularly troublesome. The reasoning of *McLain I* and *McClain II* supports a conclusion that South Dakota's ballot access laws place a severe burden on plaintiffs' rights.

      Although defendants argue for a different result based on *Burdick* and *Martin*, both cases are distinguishable. In *Burdick*, the Supreme Court held that Hawaii could prohibit write in voting, but only in light of the state's generous ballot access laws. *See Burdick*, 504 U.S. at 430. In Hawaii,

candidates could appear on the primary ballot by filing nominating papers with 15 to 25 signatures 60 days before the primary election. *Id.* at 436. South Dakota does not have an equivalent option. In *Martin*, the Eighth Circuit Court of Appeals upheld an Arkansas statute that required political parties to receive at least 3% of the vote cast for president or governor in order to retain their political party status. *Martin*, 649 F.3d at 678, 687. The court based its decision, in part, on "the many alternative paths Arkansas provides to the ballot . . . ." *Id.* at 687. For example, new political parties could secure ballot access for their presidential candidate by submitting a petition in August signed by 1,000 registered Arkansas voters. *Id.* at 678; Ark. Code Ann. § 7-8-302(5)(B). South Dakota does not have an equivalent statute. This court finds that both *Burdick* and *Martin* are distinguishable from the current case and that the burden imposed by SDCL 12-5-1 is severe.

    **B.**    **South Dakota's Regulatory Interests**

The Supreme Court recognizes that state governments must play a central role in organizing elections. *Burdick*, 504 U.S. at 433. The states ensure that elections are fair, honest, and efficient. *Id.* Defendants assert that SDCL 12-5-1 is necessary to ensure that the primary ballots are ready for the state primary election. Docket 26 at 13-15. This year the deadline imposed by SDCL 12-5-1 is March 29, 2016. The state's primary is scheduled for June 7, 2016. Because absentee voting begins on April 22, the primary ballots must be printed and with the county auditors' offices by April 20, 2016. This gives the Secretary of State's Office 22 days to review the number of signatures on the

declaration, confirm that the declaration is in the proper form, print the primary ballots, and ship the ballots to the county auditors. *Id.*

If the only question before the court was whether the March deadline gave the Secretary of State enough time to distribute the primary ballots to the individual county clerks, South Dakota would have shown a compelling state interest. Defendants have not explained, however, what interest South Dakota has in requiring new political parties to hold a primary election for their gubernatorial candidates. Any argument for why primary elections are necessary for gubernatorial candidates is undermined by the fact that South Dakota apparently does not have a similar interest in the party's selection of candidates for president, state attorney general, and other state-wide elected officials. Although South Dakota must play a central role in ensuring its elections are organized, fair, and efficient, the state has given no reason why its process for selecting a party's candidate for governor is more organized, fair, or efficient, than its process for selecting a party's candidate for president. Defendants have given no reason why third party candidates for governor must participate in the primary election. Because the court cannot determine as a matter of law on this record that the burden imposed on the plaintiffs' right to ballot access is greater than South Dakota's interest in enforcing SDCL 12-5-1, defendants' summary judgment motion is denied.

## II.     Equal Protection Challenge

Although not explicitly stated, plaintiffs' brief appears to argue that SDCL 12-5-1 violates the Equal Protection Clause of the Fourteenth

13

Amendment. Plaintiffs argue it is "irrational," "discriminatory," and "unreasonable" for South Dakota to treat candidates running for the SDCL 12-5-21 offices differently from all other candidates. Docket 33 at 3, 20-22. The Supreme Court in *Illinois State Board of Elections v. Socialist Workers Party*, 440 U.S. 173 (1979) dealt with a similar situation. There, the Illinois Election Code provided two different paths for new political parties and independent candidates to appear on the ballot. *Id.* at 175-77. If the candidates were running for a statewide office, they needed to obtain 25,000 signatures from qualified voters. *Id.* at 175. If, however, candidates were running for a local office, they needed to get signatures from "5% of the number of persons who voted at the previous election for offices of the particular subdivision." *Id.* at 176. This meant candidates running for a local office in Chicago had to collect over 10,000 more signatures than candidates running for statewide office. *Id.* at 176-77. In analyzing these statutes, the Supreme Court held that the disparate treatment of the candidates violated the Equal Protection Clause of the Fourteenth Amendment. *Id.* at 187. The Court noted that "[t]he Illinois Legislature has determined that its interest in avoiding overloaded ballots in statewide elections is served by the 25,000-signature requirement. Yet [Illinois] has advanced no reason, much less a compelling one, why the State needs a more stringent requirement for Chicago." *Id.* at 186. Because Illinois did not have a compelling reason to discriminate against candidates based on their geographic location, the Court held that the Illinois Election Code was unconstitutional. *Id.* at 187.

Plaintiffs here argue the distinction between candidates for the offices listed in SDCL 12-5-21 and all other candidates—including candidates for governor—is discriminatory. New political parties are able to pick their presidential candidates and most candidates for statewide office at a state convention. All other candidates must be placed on the primary ballot. The discrepancy means that if a declaration is submitted in July, candidates running for president and lieutenant governor can be placed on the ballot if nominated during a party convention, but candidates for governor cannot. Gubernatorial candidates must meet an earlier deadline by having their party's declaration submitted in March. Similar to the plaintiffs in *Illinois State Board of Elections*, candidates in South Dakota are being treated differently based on which office they seek, and similar to the defendants in *Illinois State Board of Elections*, defendants here have "advanced no reason, much less a compelling one" for why the distinction is necessary. As explained by the affidavit of Richard Winger, no other states use "such a peculiar election law provision." Docket 40 at 2. Because South Dakota has not given any reason for the disparate treatment, defendants' motion for summary judgment is denied.

## CONCLUSION

South Dakota's ballot access laws impose a severe burden on third parties and their candidates. Although South Dakota has an important regulatory interest in ensuring its elections are fair and efficient, defendants have advanced no reason why primary elections are necessary for some

candidates but not others. Because defendants have not given any reason for the disparate treatment, summary judgment is denied.

DATED this 9th day of June, 2016.

BY THE COURT:

*/s/ Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE