UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| LIBERTARIAN PARTY OF SOUTH DAKOTA; AARON AYLWARD, STATE CHAIR OF THE LIBERTARIAN PARTY OF SOUTH DAKOTA; BOB NEWLAND; CONSTITUTION PARTY OF SOUTH DAKOTA; LORI STACEY, STATE CHAIR OF THE CONSTITUTION PARTY OF SOUTH DAKOTA; AND JOY HOWE, SECRETARY OF THE CONSTITUTION PARTY OF SOUTH DAKOTA;<br><br>Plaintiffs,<br><br>vs.<br><br>SHANTEL KREBS, IN HER OFFICIAL CAPACITY AS SECRETARY OF STATE OF THE STATE OF SOUTH DAKOTA; AND MARTY J. JACKLEY, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE STATE OF SOUTH DAKOTA;<br><br>Defendants. | 4:15-CV-04111-LLP<br><br><br><br><br><br><br>MEMORANDUM OPINION AND ORDER |

Plaintiffs brought this action against Shantel Krebs, in her official capacity as Secretary of State of South Dakota, and Marty Jackley, in his official capacity as Attorney General of South Dakota, alleging two violations of constitution law with regard to South Dakota's ballot access laws. Both parties, represented by counsel, presented evidence and argument at trial on February 6-7, 2018. Because the State Chair of the Libertarian Party has changed since the beginning of this litigation, Plaintiffs moved to substitute Aaron Aylward, the current chair of the party, for Ken Santema, the past chair. The Court granted Plaintiffs' motion. The Court took the constitutional issues under advisement at the conclusion of trial on and, for the following reasons, now finds SDCL §§ 12-5-1, 12-6-1, 12-6-4, and 12-5-21 unconstitutional as applied to Plaintiffs.

## PROCEDURAL BACKGROUND

On June 15, 2015, Plaintiffs first brought this suit against Defendants, seeking a declaratory judgment that the deadlines in SDCL 12-5-1 violate their First and Fourteenth Amendment rights by imposing unreasonable restrictions on new political parties seeking to participate in South Dakota elections. Doc. 1, 19. Defendants moved for summary judgment on March 3, 2016, arguing that South Dakota's ballot access laws place reasonable and nondiscriminatory restrictions on political parties. Doc. 25. The Court denied Defendants' motion, reasoning that South Dakota's ballot access laws impose a severe burden on third parties and their candidates and found that Defendants had not identified a compelling reason for the disparate treatment of candidates running for political office in South Dakota. Doc. 43.

Defendants again moved for summary judgment on July 15, 2016, arguing that discovery gave support to their motion. Doc. 44. Plaintiffs moved for summary judgment on July 23, 2016, and for a permanent injunction on July 25, 2016. Doc. 54, 60. The Court denied Plaintiffs' motion for permanent injunction and subsequently denied Plaintiffs' motion to reconsider that order. Doc. 68, 73.

Plaintiffs moved to file a second amended complaint on September 12, 2016, arguing that Defendants' answer to Plaintiffs' first amended complaint raised a new interpretation of SDCL 12-5-21. Doc. 77-78. The Court granted Plaintiffs' motion to amend and Plaintiffs filed their second amended complaint on December 13, 2016, raising an additional constitutional challenged to SDCL 12-5-21 as a violation of the equal protection clause. Doc. 84-85. Because the Parties sought to conduct additional discovery, the Court denied without prejudice the pending cross motions for summary judgment on December 20, 2016. Doc. 87. Plaintiffs and Defendants subsequently filed cross motions for summary judgment on both claims raised in the second amended complaint on July 27, 2017 and July 31, 2017, respectively. Doc. 97, 102.

In denying both motions, the Court found that questions remained as to whether South Dakota had a compelling state interest in having certain candidates participate in a primary election while others can be selected by convention, and whether South Dakota's ballot access laws were narrowly tailored to further that state interest. Doc. 115 at 21-22. Additionally, because the equal protection claim necessarily required resolution of Plaintiffs' first claim, the Court could not conclude as a matter of law that South Dakota's disparate nominating process was a violation of Plaintiffs' equal protection rights. *Id.* at 25. Finding "reason to believe that the

better course would be to proceed to a full trial," the Court denied the cross motions for summary judgment and a trial was held on February 6-7, 2018. *Id.* at 26 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)).

## FACTUAL BACKGROUND

To appear on the general election ballot, South Dakota law requires party-affiliated candidates for the United States Senate, United States House of Representatives, Governor, and all state legislative seats to participate in a primary election to be held "on the first Tuesday after the first Monday in June of every even-numbered year." SDCL §§ 12-6-1, 12-2-1. In order for a new political party to participate in South Dakota's primary election, that party must file a written declaration validly signed by at least 2.5% of South Dakota voters "as shown by the total vote cast for Governor at the last preceding gubernatorial election" with the Secretary of State's office by the last Tuesday of March preceding the primary election. SDCL § 12-5-1. For the year 2018, that number is equivalent to 6,936 signatures, all of which must be filed by March 27, 2018. Any registered voter may sign the written declaration, not just a member of that party, but any signatures from more than one year prior to the declaration's filing date are invalid. *Id.* Then, for that party to put a candidate on the ballot under the party name, that candidate must receive additional signatures from the members of that party—specifically, state-wide and federal candidates must collect 250 signatures of registered party members, while county and legislative candidates require five signatures of registered party voters in that county or district. SDCL § 12-5-1.4.[1] In order to retain political party status and be eligible to participate in a primary election again the following year, the party must have a "candidate for any statewide office at the last preceding general election receive[ ] at least two and one-half percent of the total votes cast for that statewide office." SDCL § 12-1-3(10).[2] If the party fails to have a candidate receive such support, the party loses political party status and must regain it through the 2.5% petition process again in the next election year to participate in that year's primary election.

---

[1] By way of contrast, independent candidates for *any* nonjudicial public office may be nominated by filing a certificate of nomination by the last Tuesday of April. SDCL § 12-7-1. The number of signatures required for the certification of an independent candidate is one percent of the total combined vote cast for Governor. *Id.*

[2] At the start of this litigation, SDCL § 12-1-3(10) defined political party as "a party whose candidate for Governor at the last preceding general election at which a Governor was elected received at least two and one-half percent of the total votes cast for Governor."

Not all candidates for office in South Dakota must be nominated through a primary election to appear on the general election ballot, however. State law provides:

> The state convention shall nominate candidates for lieutenant governor, attorney general, secretary of state, state auditor, state treasurer, commissioner of school and public lands, and public utilities commissioner and in the years when a President of the United States is to be elected, presidential electors and national committeeman and national committeewoman of the party.

SDCL § 12-5-21. To hold a convention, a new party that does not have candidates that must participate in primaries must file a written declaration validly signed by at least 2.5% of South Dakota voters "as shown by the total vote cast for Governor at the last preceding gubernatorial election" with the Secretary of State's office by July 1st before the general election. SDCL § 12-5-1.5.[3] The party must also give 30 days notice of the time and place of its party convention. SDCL § 12-5-17. Finally, nominations must be certified and received in the Secretary of State's office by the second Tuesday in August. SDCL § 12-5-22. Plaintiffs' expert could identify no other state with an election law that sets a different filing deadline to run for attorney general or lieutenant governor than that for governor.

Plaintiffs include two political parties, the Libertarian Party and the Constitution Party,[4] and four of their current or former members. Ken Santema was originally part of the litigation as a South Dakota resident, registered voter, and Chair of the Libertarian Party of South Dakota when this suit was filed. Doc. 36, 85 at 2. At trial, Plaintiffs' counsel moved to replace Ken Santema with Aaron Aylward, who is also a South Dakota resident and registered voter, is the current Chair of the Libertarian Party of South Dakota, and is currently collecting signatures for candidacy as a state legislator on the Libertarian Party ticket. Bob Newland is a South Dakota resident, registered voter, and a member of the Libertarian Party of South Dakota who was heavily active in campaigning in the past, both as a member of the party and as a candidate on

---

[3] Both parties agree that for the 2016 election, the last day new political parties could file their signatures to access the general election ballot for the SDCL § 12-5-21 offices was July 11, 2016. Doc. 109 at 3. In 2017, the South Dakota Legislature passed SDCL § 12-5-1.5 in its current form, which has been in effect since July 1, 2017. Plaintiffs have not challenged this statute.

[4] Though the Libertarian Party and the Constitution Party are the more prominent third parties of current times, the Court notes that there was a stronger Populist movement in South Dakota in 1880–1900. *See generally* R. ALTON LEE, PRINCIPAL OVER PARTY: THE FARMER'S ALLIANCE AND POPULISM IN SOUTH DAKOTA 1880–1900 (2012). The possibility of another movement of that strength would be a consideration if the Court reached the issue of a facial challenge.

the party's ticket on a number of occasions. Lori Stacy is a South Dakota resident, registered voter, and Chair of the Constitution Party of South Dakota. Doc. 37, 85 at 3. Joy Howe is a South Dakota resident, registered voter, and was the Secretary of the Constitution Party of South Dakota when this lawsuit was filed. Ms. Howe also formerly served as Chair of the Constitution Party of South Dakota, though she is no longer a registered member. Mr. Aylward, Mr. Newland, and Ms. Howe all testified at trial.

In 2016, South Dakota's primary election was held on June 7. The Libertarian Party was unable to obtain political party status by the March 29, 2016 deadline, filling only 4,399 valid signatures. However, the Libertarian Party had continued to mail in signatures to the Secretary of State's office and had submitted a sufficient amount of signatures to regain political party status on June 17, 2016. The Constitution Party, on the other hand, successfully met the March 29, 2016 deadline with 7,655 valid signatures. Nevertheless, the Constitution Party did not hold a primary election and submitted their candidates for Presidential candidate Darrell L. Castle, Vice Presidential candidate Scott N. Bradley, US Senate candidate Kurt Evans, and State House, District 23 candidate Wayne Schmidt via convention nomination certification. The nominations for Castle and Bradley were accepted, but those for Evans and Schmidt were not, as US Senate and state legislator are not included in the list of offices that can be nominated at state party conventions pursuant to SDCL § 12-5-21.

Plaintiffs argued and this Court previously concluded its June 9, 2016 order denying Defendants' motion for summary judgment, as well as reiterated in its December 19, 2017 order denying cross-motions for summary judgment, that

> the 6,936 signature requirement coupled with the late March deadline was "particularly troublesome" for third parties because it is expensive, difficult to gather signatures during the winter months in a sparsely populated state, and people often support third party candidates after the two major political parties have chosen their candidates during the June primary election.

Doc. 115 at 18. Although both the Libertarian party and Constitution Party have qualified as new political parties by the March deadline in previous election years, the Court previously found that Plaintiffs had provided evidence that meeting such requirements is expensive and very difficult. This evidence was corroborated at trial. Plaintiffs further showed that they do not have an interest in primary ballot access for its candidates as they often find it difficult to find even one candidate for a position due to their small party registration in the state of South Dakota.

5

Plaintiffs' expert testified that, in non-presidential election years, South Dakota has the second earliest filing deadline amongst the states. In presidential election years, South Dakota's deadline ranks as the eighth earliest.

On February 6–7, 2018, the Court held trial on the remaining issues: 1) whether the ballot access law is narrowly tailored to serve a compelling state interest, *see Moore v. Martin*, 854 F.3d 1021, 1026, *cert. denied*, 2017 WL 3324827 (Oct. 10, 2017), and 2) "whether the ballot access law disadvantages one group over another so as to result in unequal treatment and whether this unequal treatment is justified by a compelling interest." *Libertarian Party of N.D. v. Jaeger*, 659 F.3d 687, 702 (8th Cir. 2011).

## DISCUSSION

Plaintiffs specifically allege that the March deadline set forth in SDCL § 12-5-1 for new political parties to submit their petitions and accompanying signatures in order to participate in South Dakota elections violates their First and Fourteen Amendment rights. Doc. 85 at 9. They further argue that defendants are interpreting and enforcing SDCL §§ 12-5-1, 12-6-1, 12-6-4, and 12-5-21, individually or in combination, "in a manner that results in invidious discrimination against candidates seeking an office not listed in SDCL § 12-5-21" as a violation of equal protection rights guaranteed by the First and Fourteenth Amendments. *Id.*

### I.   Standing

The Court has addressed standing in this case on at least two previous occasions, but, after evidence was presented at trial, Defendants again questioned whether Plaintiffs had Article III standing to challenge the ballot access provisions at issue here. Article III standing requires a plaintiff to demonstrate an injury in fact that is fairly traceable to the defendant's challenged conduct and likely to be redressed by a favorable judicial decision. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). "The existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed." *Id.* at 569 n. 4 (quoting *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 830 (1989)); *see also Davis v. Fed. Election Comm'n*, 554 U.S. 724, 732 (2008) (framing the requirement of standing as the "personal interest that must exist at the commencement of the litigation" (quoting *Friends of Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000))).

Focusing on the injuries to the plaintiffs as voters rather than the plaintiffs as candidates, this Court has previously concluded that the "restrictive nature of SDCL § 12-5-1 impacts

plaintiffs' candidates, whom plaintiffs support. Because SDCL § 12-5-1 may unconstitutionally exclude plaintiffs' candidate-of-choice from the primary election, plaintiffs have standing to challenge the law." Doc. 18 at 4. In *McLain v. Meier*, the Court found that McClain, who had unsuccessfully campaigned in North Dakota for the offices of President of the United States and United States Senator from North Dakota as an independent candidate, in his capacity as a voter, had standing to challenge the ballot access laws because they "would restrict his ability to vote for the candidate of his choice or dilute the effect of his vote if his chosen candidate were not fairly presented to the voting public." *McLain v. Meier (McLain II)*, 851 F.2d 1045, 1048 (8th Cir. 1988). "Although the primary impact of restrictive ballot access laws is on the candidates, 'the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters." *Id.* (citing *Bullock v. Carter*, 405 U.S. 134, 143 (1972)). Ultimately, the court in McLain concluded that plaintiff had standing to challenge ballot access laws because he suffered an injury as a voter that was fairly traceable to North Dakota's ballot access laws and his injury would be redressed if those laws were declared unconstitutional.

Similarly, the Plaintiffs in this case have standing to challenge § 12-5-1 because the law affects their abilities as South Dakota voters to support the candidates they choose. When each was asked to testify as to why they joined their respective parties, the individuals stated that upon learning about the principles of those parties, they found they were far more aligned with their own principles than the Republican and Democratic parties were. Each used their own time and money to further their parties' cause by driving many miles in repeated attempts to get their parties' candidates on the ballot. With exception to the young and optimistic Mr. Aylward, the other individual Plaintiffs testified to their experiences and their current involvement with clear exhaustion. Despite continuing to align with the principles of their respective parties, Mr. Newland and Ms. Howe expressed no intentions of running a campaign again because of the difficulty of doing so. The severe burden these ballot access laws place on third parties serves to restrict the candidates from these third parties that can put themselves on the ballot, further restricting the voters' ability to vote for the candidate of their choice—a candidate who aligns with their principles. A declaratory judgment that SCDL § 12-5-1's requirements are unconstitutional would allow plaintiffs to place their candidates on the November 2018 general

election ballot and vote for the candidates of their choice without having to overcome the burdens imposed by SDCL § 12-5-1's requirements, thus redressing Plaintiffs' injury.

The South Dakota Legislature has made various amendments to its ballot access laws during the course of this litigation and there are more legislative bills currently before the Legislature that could render this litigation moot. H.B. 1286, which was drafted primarily by the Defendant Secretary of State's office, for example, changes the 2.5% requirement to 1% and does away with a primary requirement for minor party candidates. However, *could* is the necessarily operative word. There is no way of knowing whether this legislation will pass and in what final form. Thus, the Court can only consider the law as it stands today.

## II.   Claim One: the Right to Associate and the Right to Vote

Plaintiffs' first claim asserts that the deadline set forth in SDCL § 12-5-1 for new political parties to submit signed petitions seeking to participate in South Dakota elections violates Plaintiffs' right to vote and their right to associate. Although these are fundamental rights protected by the First Amendment, states are permitted to restrict ballot access in order to maintain fair, honest, and orderly elections. *Anderson v. Celebreeze*, 460 U.S. 780, 787–88 (1983) ("[N]ot all restrictions imposed by the States on candidates' eligibility for the ballot impose constitutionally-suspect burdens on voters' rights to associate or to choose among candidates"). However, "even when pursuing a legitimate interest, a State may not choose means that unnecessarily restrict constitutionally protected liberty." *Kusper v. Pontikes*, 414 U.S. 51, 58–59 (1973). "The States' interest in screening out frivolous candidates must be considered in light of the significant role that third parties have played in the political development of the Nation. Abolitionists, Progressives, and Populists have undeniably had influence, if not always electoral success. As the records of such parties demonstrate, an election campaign is a means of disseminating ideas as well as attaining political office." *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 185–86 (1979).

Thus, the courts must balance the burdens and interests affected by the statutes against the recognized interests of the states in regulating elections. The Court "may uphold a specific ballot access statute as constitutional so long as the restrictions it imposes are reasonable, justified by reference to a compelling state interest, and do not go beyond what the state's compelling interests actually require." *Jaeger*, 659 F.3d at 693. In doing so, the Court must first determine "whether the challenged statute causes a burden of some substance on the plaintiff's

rights." *Id.* (citing *McLain II*, 851 F.2d at 1049). This Court thoroughly analyzed the burdens imposed by SDCL § 12-5-1 on Plaintiffs' constitutional rights in a previous opinion and concluded the burdens are severe. Doc. 43 at 7–12. Evidence presented at trial confirmed this finding.

SDCL § 12-5-1 requires new political parties to collect 6,936 signatures by March 27, 2018. Although these signatures may be by any registered voter in the state of South Dakota, regardless of party, the large number of signatures required coupled with an early deadline is very difficult for third parties to meet because 1) it is difficult to gather the signatures during the cold winter months in a sparsely populated state; 2) it is expensive, usually requiring personal expenses of the candidates themselves, without much help from the party at large; and 3) people often support third party candidates only after the two major political parties have chosen their candidates during the June primary election and their positions become known.

Even a severe burden may be justified, however, if the State can show that the ballot access law is narrowly tailored to serve a compelling state interest. *Moore*, 854 F.3d at 1026. One employee of the Secretary of State's office stated, with little conviction, that the March deadline is necessary to ensure primary ballots are ready by the June primary date. Her testimony was that, after signatures are collected, ballot preparation takes time, making the March deadline "tight, but they make it work." It appears that there was time lost at the local level. That deadline would not exist if all, rather than some, third party candidates could be selected at convention.

Counsel for Defendants urge the Court to consider that this is a facial challenge. In a brief filed on August 31, 2017, Plaintiffs themselves state, "One [of two distinct challenges raised by Plaintiff's Second Amended Complaint] is a First Amendment challenge to the facial validity of SDCL § 12-5-1 due to the onerous requirements it imposes on accessing the ballot." Doc. 110 at 2. Plaintiffs also state "Plaintiffs challenge SDCL [§] 12-5-1 on the grounds that it violates the First Amendment on its face by creating unreasonable restrictions on access to the ballot." *Id.* In relying on that characterization, this Court has previously characterized the claim as a facial challenge, a characterization to which Plaintiffs did not previously object. Doc. 115 at 17. Nevertheless, in closing arguments, Plaintiffs stated this characterization was a mistake, and that Count One has always been an "as applied" challenge.

As explained in *Iowa Right to Life Committee, Inc. v. Tooker*, "the 'label is not what matters.'" 717 F.3d 576, 587 (2013) (quoting *Doe v. Reed*, 561 U.S. 186, 194 (2010) and citing

*Citizens United v. Federal Election Commission*, 558 U.S. 310, 331 (2010) ("[T]he distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge.")). "Instead, the 'important' inquiry is whether the 'claim and the relief that would follow . . . reach beyond the particular circumstances of the [ ] plaintiffs." *Reed*, 130 S.Ct. at 2817.

A plaintiff brings a facial challenge "to vindicate not only his own rights, but those of others who may also be adversely impacted by the statute in question." *City of Chicago v. Morales*, 527 U.S. 42, 55 n. 22 (1999). By contrast, "[a]n as-applied challenge consists of a challenge to the statute's application only as-applied to the party before the court." *Phelps-Roper v. Ricketts*, 867 F.3d 883, 896 (8th Cir. 2017) (quoting *Republic Party of Minn., Third Cong. Dist. v. Klobuchar*, 381 F.3d 785, 790 (8th Cir. 2004)). A successful as-applied challenge, then, means "the statute may not be applied to the challenger, but is otherwise enforceable." *Id.* (quoting *Klobuchar*, 381 F.3d at 790). The claim at hand, like that in *Tooker*, "'has characteristics of both' challenges." *Tooker*, 717 F.3d at 587 (concluding that the court could "consider each challenged . . . requirement in isolation, and, if necessary, apply the 'normal rule that partial, rather than facial, invalidation is the required course'"). In their second amended complaint, Plaintiffs ask the Court for declaratory relief and ask that the Court "[e]njoin defendants from enforcing the deadline set forth in SDCL § 12-5-1 for new political parties to submit signed petitions seeking to organize and participate in elections," and "[o]rder defendants, until such time as the South Dakota Legislature enacts a constitutionally adequate law, to provide that a new or newly-qualifying political party can nominate all its candidates by convention," which are indeed quite broad and sweeping remedies. Doc. 85 at 9–10. However, Plaintiffs further ask that the Court enter a declaratory judgment and enjoin defendants from enforcing SDCL §§ 12-5-1, 12-6-1, 12-6-5, and 12-5-21, "to the extent they prohibit plaintiffs from nominating all of their candidates by convention in a manner allowed certain candidates by SDCL 12-5-21." *Id.* Further, both the Constitution and the Libertarian parties have established that the statutes as applied to those political parties left them unable to put candidates other than those set forth in 12-5-21, the convention candidates, on the ballot for the 2016 election.

"In crafting an appropriate remedy, the Court seeks to go no further than necessary to address the constitutional wrong supported by this record." *Gerlich v. Leath*, 152 F. Supp. 3d

1152, 1180 (S.D. Iowa 2016) (citing *Rogers v. Scurr*, 676 F.2d 1211, 1214 (8th Cir. 1982), *Coca-Cola Co. v. Purdy*, 382 F.3d 774, 790 (8th Cir. 2004)).

> Facial challenges are disfavored for several reasons. Claims of facial invalidity often rest on speculation. As a consequence, they raise the risk of "premature interpretation of statutes on the basis of factually barebones records." Facial challenges also run contrary to the fundamental principle of judicial restraint that courts should neither "anticipate a question of constitutional law in advance of the necessity of deciding it" nor "formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." Finally, facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution. We must keep in mind that "[a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people."

*Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450–51 (2008). With these principles in mind, "the Court fashions a remedy that addresses the specific conduct of the Defendants that adversely impacted these Plaintiffs," and construes Count 1 to be an as-applied challenge, as Plaintiffs submitted in their closing arguments. *Gerlich*, 152 F. Supp. 3d at 1180–81; *see also Green Party of Penn. v. Aichele*, 89 F. Supp. 3d 723, 737–38 (E.D. Pa. 2015) ("[T]he 'usual judicial practice' is to address an as-applied challenge before a facial challenge.").

Ballot access cases have emphasized that the States "have important interests in protecting the integrity of their political processes from frivolous or fraudulent candidacies, in ensuring that their election processes are efficient, in avoiding voter confusion caused by an overcrowded ballot, and in avoiding the expense and burden of run-off elections." *Clements v. Fashing*, 457 U.S. 957, 964-65 (1982) (citing *Ill. State Bd. of Elections*, 440 U.S. 173 (1979), *Storer v. Brown*, 415 U.S. 724 (1974), *Am. Party of Texas v. White*, 415 U.S. 767 (1974), *Jenness v. Fortson*, 403 U.S. 431 (1971), *Williams v. Rhodes*, 393 U.S. 23 (1968)). In recognizing these interests, the Supreme Court has upheld "reasonable level-of-support requirements and classifications that turn on the political party's success in prior elections." *Id.* at 965. Defendants have correctly noted these interests throughout this litigation. However, other than these broad, generalized assertions, Defendants have not explained nor presented evidence as to why a 2.5% signature requirement by the last Tuesday in March is necessary for new political parties so that they may hold a primary election in June for only certain candidates. In fact, the Defendant Secretary of State, the elected official responsible for administering the election laws, requested the introduction of H.B. 1286 in the current session of the S.D.

Legislature. The bill, as introduced, would do away with the primary requirement for minor party candidates as well as reducing the party recognition requirement to 1% from 2.5% of voters in the last gubernatorial election. The Secretary's testimony at trial confirmed those positions. Defendants have not explained, when analyzing the entire election scheme, why these interests are not sufficiently satisfied by the demonstrated support shown when a new political party satisfies the signature requirement of SDCL § 12-5-1.4, which requires a specific number of signatures to support the candidate before that individual may run as a party candidate. *See Libertarian Party v. Bond*, 764 F.2d 538, 541 (8th Cir. 1985) ("It has been recognized, however, that the entire election scheme must be analyzed to determine whether undue constraints on access to the ballot exist.").

Plaintiffs have demonstrated that the Libertarian and Constitution parties of South Dakota have no need nor desire for primary elections, when they are happy to have even one candidate for a position on the ballot. Further, "[t]he courts have acknowledged the necessity of giving third party and independent candidates an opportunity to capitalize on the disaffected group of voters created only after the major parties platform and candidates are known." *Jaeger*, 659 F.3d at 701. Nevertheless, the *Jaeger* court upheld as constitutional the burden imposed by requiring new parties to participate in a primary because "the courts have also held primaries are a reasonable basis for determining candidate support." *Id.* In *Jaeger*, North Dakota required a new political party to obtain 7,000 signatures statewide to show sufficient party support. *Id.* at 698. The candidates themselves could then establish a sufficient modicum of support for themselves as a candidate by participating in a primary election. *Id.* at 691. That candidate was placed on a primary election ballot by either filing a petition or by receiving a party endorsement. *Id.* The candidate which earned the highest number of votes within his or her party designation in the primary election would be named on the general ballot only if the number of votes the candidate received was equal to the number of signatures which was, or would have been, required to have the candidate's name placed on the primary election ballot through petition—that number being the lesser of either 1% of the district population or 300 votes. *Id.* at 692. What makes the system in *Jaeger* so glaringly different from the one at hand, however, is that once a party obtained those 7,000 signatures, it did not have to regain those signatures in future years. *Id.* at 699. The necessity of the lesser of 1% or 300 primary vote requirement then became evident when considering the fact that the 7,000 signature requirement on which the party and its candidates

relied as their showing of support was a one-time occurrence, and said nothing about the particular candidate on the ballot. *Id.* In fact, the challenged statute was "the only protection the state ha[d] from frivolous party candidates and ballot overcrowding in subsequent elections." *Id.* By contrast, South Dakota continuously requires a political party to establish support for itself as a party, shown either by support in the general election or through the 6,936 signature requirement, as well as for its party candidates, through their own signature requirement. Plaintiffs' expert also established that South Dakota has never had more than five parties on a ballot. Further, the court in *Jaeger* could not find evidence that the challenged statute itself was the reason candidates had been absent from the general election since 1976. *Id.* In this case, however, if not for SDCL § 12-5-1, the Constitution Party would have had party candidates on the 2016 general election ballot running for both the U.S. Senate and for the state legislature, instead of just for president and vice president.

In 1984, as a result of the settlement and dismissal of litigation in this Court, South Dakota established a deadline for the first Tuesday in April for new parties to gather petitions for party status. *See Libertarian Party v. Kundert*, 3:83-cv-03071 (Ms. Kundert was the Secretary of State at the time). In 2007, that deadline was changed to the fourth Tuesday in March, the deadline that still exists. There is no legislative history or other evidence presented as to why the change was made. No compelling interest was shown as to why the March deadline was necessary when April had apparently worked from 1984 to 2007. But Defendants did not, even after trial, explain the state's interest in requiring new political parties to hold a primary election to select its gubernatorial and other candidates, especially in light of the fact that it does not require those parties to hold a primary election for president, attorney general, or for other statewide elected officials. In other words, what is the state's interest in ensuring new party candidates have shown a sufficient amount of support before being placed on the ballot satisfied by nomination at the party's convention for certain candidates, but not for others? Examining South Dakota's interests in treating some statewide candidates differently in the nomination process, Defendants state that "South Dakota, as a policy, has determined that those who create and affect the laws should be chosen in a more populous manner," which is the primary election process, while those who implement the laws can be chosen by party convention. Thus, defendants attempt to distinguish the two types of candidates by "the amount and type of power they hold." This interest put forth by Defendants, in theory, makes sense for the two major

political parties. In our two-party dominant system, the Republican and Democratic parties often have more than one candidate for each political office and thus need to run in a primary election where the registered voters of each party must choose their candidate. This is a more populous manner of selection. But Defendants have not explained why this rationale should apply to new political parties. The purpose of a primary election is to choose which candidates will represent a particular political party in the general election. But new political parties rarely require a primary because they seldom have more than one candidate running for the same position. "The fact is there are obvious differences in kind between the needs and potentials of a political party with historically established broad support, on the one hand, and a new or small political organization on the other....Sometimes the grossest discrimination can lie in treating things that are different as though they were exactly the same." *Jenness*, 403 U.S. at 441-42.

Because the Court concludes the Defendants have failed to establish that the substantial burden created by SDCL § 12-5-1, when examined in the context of the entire ballot access scheme, is no more restrictive than necessary to serve a compelling state interest, the Court finds SDCL § 12-5-1 unconstitutional as applied to the Libertarian and Constitution parties of the state of South Dakota.

### III.   Claim Two: Equal Protection

To determine whether a statute violates the Equal Protection Clause, the Court considers "the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification." *Williams*, 393 U.S. at 30. In analyzing the Plaintiffs' equal protection challenge, then, the interests and burdens at issue are the same as those that were balanced in their First and Fourteenth Amendment challenges discussed above. In the context of equal protection, then, the Court must consider "whether the law disadvantages one group over another so as to result in unequal treatment and whether this unequal treatment is justified by a compelling interest." *Jaeger*, 659 F.3d at 702 (citing *Williams*, 393 U.S. at 30). Although "reasonable election regulations may, in practice, favor the traditional two-party system," *Green Party of Arkansas v. Martin*, 649 F.3d 675, 684 (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 367 (1997)), they may not serve the purpose of allowing the same two parties "to retain a permanent monopoly on the right to have people vote for or against them." *Williams*, 383 U.S. at 32. "Competition in ideas and governmental policies is at the core of our electoral process and of the First Amendment freedoms. New parties

struggling for their place must have the time and opportunity to organize in order to meet reasonable requirements for ballot position, just as the old parties have had in the past." *Id.*

The March deadline by which parties must receive signatures totaling 2.5% of the votes cast in the last gubernatorial election does not grant new parties the time or the opportunity to organize in order to place candidates who cannot be nominated by convention on the general election ballot. Testimony at trial established how this requirement effectively freezes the two-party status quo by ensuring minor parties and their candidates have little money to campaign for their candidates when they must also spend so much time and money so early in the election season pursuing a primary election that they do not need, particularly when support for third-party candidates comes much later in the election year. Because Defendants cannot establish a distinction between new party candidates for governor, state legislature, and other positions from new party candidates for secretary of state, attorney general, and lieutenant governor, Defendants cannot and have not met their burden of showing a compelling reason as to why new party candidates for the former positions must undergo such a burdensome ballot access regime while candidates for the latter category do not. Therefore, South Dakota's ballot access laws result in discrimination against new party candidates seeking an office not listed in SDCL § 12-5-21. As this unequal treatment is not justified by a compelling state interest, it is in violation of the Equal Protection Clause of the United States Constitution.

## CONCLUSION

Where restrictions on access to the ballot are involved, states must adopt the least restrictive means to achieve their ends and the state's interests must be considered in light of the significant role third parties have played in the political history of this country. *See Ill. State Bd. of Elections*, 440 U.S. at 184–86. The Court finds that the Defendants did not meet their burden of showing that the substantially burdensome ballot access provisions challenged by Plaintiffs are narrowly tailored to serve a compelling state interest. *See Moore*, 854 F.3d at 1026. Further, the ballot access law at issue disadvantages one group over another so as to result in an unequal treatment which is not justified by a compelling interest. *Jaeger*, 659 F.3d at 702. Accordingly,

> IT IS ORDERED that SDCL §§ 12-5-1, 12-6-1, 12-6-4, and 12-5-21 violate the First and Fourteenth Amendment rights guaranteed by the United States Constitution as applied to Plaintiffs.

Dated this 21st day of February, 2018.

BY THE COURT:

/s/ Lawrence L. Piersol
Lawrence L. Piersol
United States District Judge

ATTEST:
MATTHEW W. THELEN, CLERK

BY: /s/ Deb Peterson
Deputy